929 F.2d 1280
 21 Bankr.Ct.Dec. 900, Bankr. L. Rep. P 73,878,
14 UCC Rep.Serv.2d 914
 In re Goldine G. KNUDSON and Duane A. Knudson, d/b/a
Goldie's Furniture, Debtors.
Phillip D. ARMSTRONG, Trustee of the Estate of Goldine G.
Knudson and Duane A. Knudson, d/b/a Goldie's
Furniture, Appellant,
v.
DAKOTA BANK AND TRUST COMPANY, BISMARCK, NORTH DAKOTA, Appellee.
 No. 90-5122ND.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 13, 1990.
Decided April 5, 1991.
 
 1
 Phillip D. Armstrong, Minot, N.D., for appellant.
 
 
 2
 Malcolm H. Brown, Mandan, N.D., for appellee.
 
 
 3
 Before McMILLIAN and GIBSON, Circuit Judges, and ARNOLD,* District Judge.
 
 
 4
 MORRIS SHEPPARD ARNOLD, District Judge.
 
 
 5
 For several years, Duane and Goldine Knudson operated three furniture stores in North Dakota under the name "Goldie's Furniture." In January, 1984, they incorporated under that name. In May, 1984, the Knudsons opened a checking account in the name of "Goldie's Furniture, Inc.," with the Dakota Bank and Trust Company of Bismarck, North Dakota. In doing so, they signed a setoff agreement stating that the bank could apply the funds in the account to any debt owed to the bank by either of the Knudsons.
 
 
 6
 In November, 1984, the bank lent $160,000 to "Goldie's Furniture" for operating expenses. In connection with that loan, the Knudsons executed two security agreements. One agreement gave the bank a security interest in personal property held for sale or lease (inventory) and proceeds from that property; the other gave a security interest in equipment of any kind then owned or later acquired. The bank subsequently filed a financing statement as to those security interests. The initial loan agreement, the final loan contract, the security agreements, and the financing statement all listed the debtor as "Goldie's Furniture" and were signed by the Knudsons without any designation of representative capacity. In September, 1985, the bank declared the loan to be in default and immediately applied the checking account balance of approximately $20,000 to the amount owed on the loan.
 
 
 7
 In October, 1985, the Knudsons filed as individuals "d/b/a Goldie's Furniture" for reorganization under the bankruptcy statutes, closed one store, and agreed to liquidate the inventory of another store. The Knudsons and the bank executed a stipulation that gave the bank the proceeds of the liquidation sale and granted to the bank a "continuing lien" on the inventory of the store remaining in operation. The bankruptcy court accepted the stipulation. In April, 1987, the bank foreclosed on the remaining store inventory and on several vehicles owned by the Knudsons and applied the proceeds toward the outstanding loan balance.
 
 
 8
 In May, 1987, the reorganization was converted to a liquidation. In February, 1989, the estate trustee brought an adversary proceeding in bankruptcy court against the bank, seeking to avoid the bank's application of the checking account balance, the vehicle sale proceeds, and the final inventory sale proceeds toward the outstanding loan balance.
 
 
 9
 In September, 1989, the bankruptcy court held that the bank had not perfected a security interest in the checking account or the vehicles. The bankruptcy court found, however, that the bank was entitled to approximately $6,300 of the checking account funds because of the setoff agreement signed by the Knudsons. Finally, the bankruptcy court held that because it had accepted the stipulation with regard to a lien on the final inventory sale proceeds, that transaction was not avoidable by the trustee. Both sides appealed the bankruptcy court's order to the district court.
 
 
 10
 In February, 1990, the district court found that the bank had perfected a security interest in both the checking account and the vehicles and therefore that the bank was entitled to all of those amounts in question. In addition, the district court affirmed the bankruptcy court's holding that the transfer of the final inventory sale proceeds was not avoidable. The trustee appealed to this court as to all three issues. We affirm in part and reverse in part.
 
 I.
 
 11
 The trustee argues that no security interest in the checking account was ever granted to the bank. Alternatively, he argues that any interest that may have been granted was never properly perfected. The bank argues that the security agreement on personal property granted to the bank a security interest in the checking account and, moreover, that the financing statement was sufficient to perfect that interest. The court agrees with the trustee as to both points.
 
 
 12
 The security agreement on personal property states that a security interest is created in "All Accounts (rights to payment for Goods sold or leased or for services rendered) of Debtor now existing or hereafter at any time acquired." In the court's view, this clearly is intended to refer to accounts receivable for the business, not bank accounts. This conclusion is supported by the fact that the security agreement contained other categories of property that could have been marked with an "x" to designate the creation of a security interest in the checking account but were, in fact, not so marked. One in particular would have covered the checking account, in the court's opinion--the one for specific "Accounts" to be listed on a separate schedule.
 
 
 13
 As its primary authority, the bank cites Smith v. Mark Twain National Bank, 805 F.2d 278 (8th Cir.1986). That case, however, dealt with certificates of deposit and repurchase agreements[1] that were found to have been expressly pledged to the bank and hence to have been instruments to which a security interest in favor of the bank could attach. Id. at 285-86. There was no such explicit pledge of the checking account in this case.
 
 
 14
 The district court found a security interest in the checking account by virtue of the category for "Proceeds." The trustee argues, though, that the money in the checking account reflected income from at least two stores and asserts that the security interest, if indeed there was one, was applicable only to proceeds from one store, because the security agreement and the financing statement contain only the address of one store. Because this court finds that any security interest in the checking account that might have existed was never properly perfected, however, it is not necessary to consider whether the category of "Proceeds" would have included the checking account in the items in which a security interest was created.
 
 II.
 
 15
 The checking account was opened in the name of "Goldie's Furniture, Inc." All evidence, however, indicates that the bank considered itself to be doing business with, and lending money to, the Knudsons as individuals using a trade name, not a corporation.[2] The signatures on the application to open the checking account, for example, are those of the Knudsons individually, without any designation of representative capacity. The setoff agreement is part of the application for the checking account, and the fact that the agreement allowed for the right of setoff against individual debts is additional evidence that the bank considered itself to be dealing with the Knudsons as individuals. Every single document associated with the loan and the security interests concomitant to it, moreover, cites "Goldie's Furniture" as the debtor and contains the signatures of the Knudsons without any designation of representative capacity. The bank's letter about default on the note, furthermore, is addressed to "Duane and Goldie" and refers to "[y]our note," "your inventory, accounts receivable and vehicles," and "your account" (specifying the checking account). Finally, when the bank sued in state court to collect on the note, it sued not the corporation, but the Knudsons as individuals doing business under a trade name.
 
 
 16
 Under North Dakota law, a financing statement seeking to perfect a security interest in collateral associated with a loan to the Knudsons would be "sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor, and contains a statement indicating the types, or describing the items, of collateral." See N.D.Cent.Code Sec. 41-09-41(1). A financing statement "sufficiently shows the name of the debtor if it gives the individual, partnership, or corporate name of the debtor, whether or not it adds other trade names or the names of partners." See N.D.Cent.Code Sec. 41-09-41(7). A financing statement "substantially complying with the [above] requirements ... is effective even though it contains minor errors which are not seriously misleading." See N.D.Cent.Code Sec. 41-09-41(8).
 
 
 17
 The financing statement in this case listed "Goldie's Furniture," not either or both of the Knudsons, as the debtor and evidently was filed and indexed under that name as well. The question, then, is whether such a financing statement would be sufficient under the law to perfect a security interest in property belonging to the Knudsons. The significance of this question, of course, is that an unperfected security interest of the type at issue here is avoidable by the trustee. See 11 U.S.C. Sec. 547(c)(5).
 
 
 18
 To be effective, a financing statement "must reasonably notify a creditor of prior interest in [a debtor's] property." In re Alexander, 39 B.R. 110, 111 (Bankr.D.N.D.1984). "[T]he bottom line [to test sufficiency] is whether a third-party searcher would be reasonably likely to find the financing statement." B. Clark, The Law of Secured Transactions under the Uniform Commercial Code Sec. 2.09(1)(a) at 2-71 (2d ed. 1988). See also 2 J. White and R. Summers, Uniform Commercial Code Sec. 24-18 at 377-78 (3d ed. 1988). See generally Annotation, Sufficiency of Designation of Debtor or Secured Party in Security Agreement or Financing Statement under UCC Sec. 9-402, 99 A.L.R.3d 478, especially Sec. 2(a) at 487-88, Sec. 8 at 497-509, Sec. 9 at 509-17, Sec. 17 at 527-34, and Sec. 20 at 536-42 (1980).
 
 
 19
 A third-party searcher looking under "Knudson" or even any variation of it would not find the financing statement at issue in this case unless he or she already knew that the Knudsons did business under the trade name of "Goldie's Furniture" and thought to search under that name as well. It cannot be presumed that all creditors of the Knudsons would have that knowledge. See, e.g., Pearson v. Salina Coffee House, Inc., 831 F.2d 1531, 1536 (10th Cir.1987); In the Matter of Thrift Shoe Company, Inc., 502 F.2d 1211, 1213 (9th Cir.1974); and In the Matter of Thomas, 466 F.2d 51, 53 (9th Cir.1972); see also In re Pacific Trencher and Equipment, Inc., 735 F.2d 362, 364 (9th Cir.1984). The court holds, therefore, that a third-party searcher would not be "reasonably likely" to find the financing statement, B. Clark, The Law of Secured Transactions Sec. 2.09(1)(a) at 2-71, and, accordingly, that the financing statement was insufficient to perfect any security interest that might have been created in the checking account. See, e.g., Pearson, 831 F.2d at 1536; In the Matter of Leichter, 471 F.2d 785, 787 (2d Cir.1972) (per curiam ); and In the Matter of Thomas, 466 F.2d at 52.
 
 III.
 
 20
 Even though the court finds that no security interest in the checking account was created or, alternatively, that any such security interest was never properly perfected, the trustee is not necessarily entitled to recover all of the amount applied by the bank to the outstanding balance of the loan. When the Knudsons opened the checking account, they signed an agreement allowing the bank to set off any balance in the checking account against debts owed to the bank by either of them.
 
 
 21
 The bank declared the note to be in default in September, 1985, and immediately set off the checking account balance against the amount due; that was six weeks before the Knudsons filed for reorganization. Pre-petition setoffs are governed in general by state law. See In re Saugus General Hospital, Inc., 698 F.2d 42, 44 (1st Cir.1983). North Dakota law forbids setoffs except for those pursuant to judicial process or with the consent of the depositor. See N.D.Cent.Code Sec. 6-03-67. The court holds that the setoff agreement reflects the Knudsons' consent for the bank to set off the checking account balance against the amount of the note.
 
 
 22
 The bankruptcy statutes permit the trustee to avoid certain transactions between debtors and creditors that occur within 90 days before filing. See 11 U.S.C. Sec. 547(b)(4)(A). The setoff was made within that period. A different section of the statute, however, makes an exception for certain setoffs. See 11 U.S.C. Sec. 553(a). Under this exception, a bank may set off the amount that would have been available to it as of 90 days before the bankruptcy filing, see 11 U.S.C. Sec. 553(b)(1)(A); the trustee recovers the remainder of any setoff above that amount. Id.
 
 
 23
 Using this test, the bankruptcy court found that the bank was entitled to a setoff of $6,374.21 and that the trustee could recover $13,709.05 of the amount actually appropriated. This court holds that the bankruptcy court's finding on this issue was correct.
 
 IV.
 
 24
 As to the vehicles, the trustee argues that the only security agreements executed at the time of the loan were for personal property held for sale or lease (inventory) and for equipment. He further states that at trial, the bank asserted a security interest in the vehicles by virtue of the agreement covering "equipment." He argues, however, that vehicles are not considered in law to be "equipment" and therefore could not have been covered by that agreement.
 
 
 25
 The trustee further argues that the loan contract, which the district court characterized as granting a security interest, is not legally sufficient to grant such an interest but was merely a recitation of what the parties would do in the future. His conclusion, then, is that no security interest was ever granted to the bank, and that the district court's discussion of how a security interest, once granted, is perfected under state law is beside the point.
 
 
 26
 The bank argues that under North Dakota law, the vehicles (two trucks, a van, and a car) are included in the description of equipment because they were used for business, and that they are therefore covered by the security agreement on equipment. It further argues that even if the security agreement does not cover the vehicles, the loan contract does, since it meets the statutory definition in state law of "providing for" a security interest. Finally, the bank argues that the security interest in the vehicles was properly perfected by listing of the bank as lienholder on the title documents.
 
 
 27
 North Dakota law states that goods are "equipment" if they are "used or bought for use primarily in business." N.D.Cent.Code Sec. 41-09-09(2). The titles for one truck and one van reflect the owner as being Goldie's Furniture. The title for the other truck is referenced in the exhibits but is missing; however, the district court opinion states that the owner is listed on it as being Goldie's Furniture. The title for the car lists the owner as being the Knudsons.
 
 
 28
 In the court's view, it is reasonable to presume, because the vehicles were listed as being owned by the business, that the two trucks and the van were used in the business.[3] The court holds, therefore, that they are included in the category of "equipment" covered by the security agreement.[4] The bank having been listed as lienholder on the title documents for those vehicles, the bank's security interest was properly perfected. See, e.g., N.D.Cent.Code Sec. 35-01-05.1; see also In re Star Safety, Inc., 39 B.R. 755, 757 (Bankr.N.D.1984).
 
 
 29
 The district court is, accordingly, affirmed as to the question of the vehicles, subject to a determination of whether the car was also used in the business.
 
 V.
 
 30
 The court turns last to the question of the final inventory sale proceeds. On November 7, 1985, the Knudsons and the bank executed a stipulation that stated that all of the inventory in the two stores then still open (one in Bismarck, one in Dickinson) was subject to a lien in favor of the bank. The stipulation provided for the immediate liquidation of the inventory of the Bismarck store and for payment of the proceeds from that liquidation to the bank, which would apply that money toward the outstanding loan balance. The stipulation stated that the proceeds from sales at the Dickinson store,[5] which was to stay in business, would be paid to the bank but then released back to the Knudsons to use for operating expenses at the Dickinson store. The stipulation granted to the bank a "continuing lien" on the inventory of the Dickinson store for an amount up to that previously released for operating expenses.
 
 
 31
 The same day, the bankruptcy court entered an order allowing the Knudsons to use the cash collateral to operate the Dickinson store, subject to the terms of the stipulation.[6] The bankruptcy court's order referred to 11 U.S.C. Sec. 363(c)(2) as the source of authority for granting permission to the Knudsons to use the cash collateral. The relevant part of that statute provides that a trustee[7] may use cash collateral only if the bankruptcy court authorizes that use after notice and a hearing. See 11 U.S.C. Sec. 363(c)(2)(B).
 
 
 32
 The inventory from the Dickinson store was liquidated in April, 1987. The bank applied the proceeds from that final liquidation sale to the outstanding loan balance. The trustee sought to avoid that transfer in an adversary proceeding filed in February, 1989. The bankruptcy court held that because it had accepted the stipulation granting the bank a lien in the cash collateral and the remaining inventory, that transfer could not be avoided. See 11 U.S.C. Sec. 549(a)(2)(B); see also Vogel v. Russell Transfer, Inc., 852 F.2d 797, 800 (4th Cir.1988). The district court affirmed that holding.
 
 
 33
 The trustee argues, first, that the stipulation did not grant a lien but merely declared the continuation of a security interest already granted by virtue of the security agreements executed at the time of the loan. The trustee then argues that the defects in the financing statement filed, discussed earlier, mean that the previous security interest, continued by the stipulation, was never perfected.
 
 
 34
 This court does not agree that the stipulation was only a recitation of the existence of a previously acquired security interest. The preface to the stipulation makes it clear that the question of the existence of a security interest in the inventory was disputed, that the Knudsons wanted to be able to use the proceeds of inventory sales, and that the agreement was reached in order to allow them to do that without further dispute. The clear import of the stipulation is that, henceforth, the bank was to be recognized as having a security interest in the inventory and proceeds from inventory sales. For that reason, the court holds that the stipulation did grant a security interest to the bank. That grant having occurred post-petition, the provisions of 11 U.S.C. Sec. 549(a)(2)(B) apply.
 
 
 35
 The court also finds that the bankruptcy court's explicit reference to the stipulation in its order allowing the Knudsons to use the cash collateral is an acknowledgment that the grant of the security interest created by the stipulation was "authorized ... by the court." See 11 U.S.C. Sec. 549(a)(2)(B). Anticipating the possibility of this result, the trustee argues in the alternative that if the stipulation was approved by the bankruptcy court, a lack of due process in the proceedings leading up to the bankruptcy court's order renders that approval void.
 
 
 36
 The bankruptcy statute states that any court-authorized use of cash collateral must be preceded by "notice and a hearing." See 11 U.S.C. Sec. 363(c)(2)(B). The trustee argues that the notice of the hearing on the Knudsons' motion to use cash collateral generated from inventory sales contained nothing to alert creditors to the fact that the bank might be granted a security interest in the inventory or inventory sale proceeds. In the court's view, however, the trustee has no standing to raise the issue of insufficient notice to creditors, especially when nothing in the bankruptcy court docket sheets indicates any motion by a creditor to set aside either the stipulation or the bankruptcy court's order approving it.
 
 
 37
 Accordingly, the district court is affirmed as to the question of the final inventory sale proceeds.
 
 VI.
 
 38
 For the reasons stated, this court affirms the district court as to the vehicles and the final inventory sale proceeds and reverses the district court as to the checking account balance, as specified above. The case is remanded to the bankruptcy court for entry of an appropriate judgment.
 
 
 
 *
 The HONORABLE MORRIS S. ARNOLD, United States District Judge for the Western District of Arkansas, sitting by designation
 
 
 [1]
 The repurchase agreements related to loans from the debtor to the bank specifying amounts due to the debtor from the bank (in other words, promissory notes from the bank to the debtor). See Smith v. Mark Twain National Bank, 805 F.2d 278, 280 n. 2 (8th Cir.1986)
 
 
 [2]
 Because the court concludes that all dealings between the parties were predicated on the Knudsons' status as individuals, and not as a corporation, the court has ignored the corporate form as well
 
 
 [3]
 The bank seems to acknowledge that the car may not have been used for business and is therefore not covered by the security agreement. If the parties cannot agree on whether the car was used in the business, that issue will need to be determined by the bankruptcy court
 
 
 [4]
 It is therefore unnecessary to reach the question of whether the loan contract would be effective to create a security interest
 
 
 [5]
 The stipulation referred to this money as "cash collateral."
 
 
 [6]
 The stipulation itself was not filed until November 13, 1985, but the bankruptcy court order's reference to it is unambiguous
 
 
 [7]
 At the time of execution of the stipulation, the Knudsons were debtors in possession and had the powers of trustees. See 11 U.S.C. Sec. 1107(a)